Schools. We have, departing from our usual practice a little bit, we have arranged for each party to have two minutes to start, and we're going to do our very best not to ask questions in those first two minutes. I think that's all I need to say by way of proceeding, so we are ready to begin. Thank you. Good afternoon, Your Honor. John Bursch on behalf of the plaintiffs. I have reserved five minutes for rebuttal, and I appreciate the two minutes, Madam Chief Justice. May it please the court. Defendant C.I.A.C. and its member schools enforced a policy that allowed two biologically male students to displace girls from track races and the winner's podium. Plaintiffs had standing when they sued for sex discrimination, leaving two issues for the court to decide on. First, whether this case is mooted by plaintiffs and intervenors' graduation, and second, whether plaintiffs' damages are barred by Pennhurst. For purposes of standing or mootness, this court assumes that the plaintiffs will succeed on the merits of their claim. The only question is whether plaintiffs have a redressable injury, and they do. If the situation were reversed and the C.I.A.C. refused to recognize the intervenors' sports records, they too would have a concrete, particularized, and actual injury, which is why they agree that plaintiffs have one. In both instances, that injury is redressable by correcting the athletic records, an action that the policies of the conference recognize it has the power to affect, and by nominal damages. As for Pennhurst, the inquiry does not churn on whether officials knew that a particular action was discriminatory, but rather on whether that action was intentional, and policies are nearly always intentional. This court should reverse and remand for a merits determination. I'll begin with plaintiff's injury, which is that the existing athletic records do not recognize the plaintiff's actual victories and placements in the races in which they competed. For example, Plaintiff Mitchell is her school's first female state open champ in a running race, and yet the records don't recognize that. That is an injury. The intervenors agree with that, because records and recognitions have inherent value, whether it's a magna cum laude, or an order of the coif, a place in the race, or even a military honor. All of these things have inherent value, because they show that someone is worthy of emulation. In the context of high school sports, there's a reason that we have trophy cases in the hallways of our high schools. It's not just to recognize... Let me just say for the moment that there is an injury here. On the issue of redressability, your briefing points to cases in which courts have found a live controversy where athletic associations, if I'm understanding the cases correctly, have thought to have an injunction vacated, an injunction which permitted the athlete to compete, so that the association could thereafter alter the records, removing the athlete on the ground that, as it turned out, he or she wasn't eligible. In those cases, the claim is that the athlete was ineligible to compete at the time under the association's applicable rules. In this case, everyone agrees that Yearwood and Miller were eligible to compete under the rules as they existed at the time. Does that make a difference for redressability? Well, Madam Chief Judge, we don't agree that they were eligible under the rules at the time, because Title IX was the applicable rule at the time. Title IX governed the races before, during, and after the races, and those are the rules that apply. But even if that were not the case, what those athletic record cases, as well as the circuits that have said that there was ongoing standing in Article III jurisdiction, in student records cases all say... When they ran their races, were they not in compliance with the rules of the CIAC and the applicable rules of the schools involved? Judge Chin, they were in compliance with the conference's rules and the school's rules, but not with Title IX. If you accept our interpretation of Title IX, as we do on a motion to dismiss for a standing inquiry, there was a rule violation. And so what the other circuits, and there's seven of them, four on the athletic side... Has there ever been a case where the records were rewritten or an athlete was stripped of her victories or records where the athlete was in compliance with the rules? I'm not aware of a case that does that, but what the cases make clear, and the Seventh Circuit is the one that articulates this test most clearly. This is the Crane case from 1992. The test for mootness is whether relief would make a legal difference to the party. So it doesn't matter whether records are being struck, left alone, or corrected. No matter who's got the bone to pick with the policy, all of those people have standing, which is why the interveners would have standing if this case were flipped around the other way and those were the records that were not being acknowledged. Counsel, do I understand the argument on this distinction, your argument to be maybe that matters in a kind of balancing of the harms and what remedy is available, but you don't think it matters in terms of the sort of logic of the addressability of the injunction that you're seeking? Well, we're not seeking an injunction against the policy anymore. I think everybody agrees that that is moot. Our contention is that there is still an ongoing harm from the fact that their resumes have been degraded, that they don't have the championships and the placements and the advancements that they otherwise would have. So let me give you an example. Say that there was a black student in high school and he was about to graduate and he was eligible for a summa cum laude recognition, but he had a racist teacher who gave him a D in a class when he had actually earned an A objectively and so he was downgraded to a magna cum laude. That student would have an opportunity to go to court and prove that there was racial discrimination that took place to not only get the A in that class that he had earned, but also to get the summa cum laude designation because those recognitions matter far into the future. Isn't that partly because there's something derogatory about that situation? What's derogatory here? Well, derogatory maybe isn't the word that I would use, but with respect to the girls in some cases they were champions and the records don't reflect that and so they have been downgraded from what they should have achieved just as the student was downgraded from summa cum laude to magna cum laude. It would be the same if someone had a military honor that was denied them. So how is that a redressable injury? It sounds like it's a matter of psychic satisfaction, a moral victory, and our cases say that those kinds of things are not sufficient to confer Article III standing. I mean, they may mean a lot and may be worth a lot, but we're talking about Article III standing here. Yeah, Judge Chin, we fully agree that psychic injury is not enough to get into court on Article III jurisdiction, but if someone would take away, for example, your magna cum laude designation from your law school for some unlawful reason, you would have a cognizable right against redressability. I hate magna cum laude. But that's true of any recognition. If you were in the military and you had received a military recognition and it was taken away from you because of a violation of the law, you would have standing to pursue that. Civil rights plaintiffs routinely would be barred from the courtroom if it were the case that simple lack of recognition was not recognized by the court as a redressable injury. One of the things I'm struggling with is all of the examples that you're giving are examples in which a recognition can be conferred without taking anything away from anyone else. And I'm trying to think of, I wasn't able to find any cases that dealt with a situation where the remedy that you're seeking, which is to take someone who complied with the rules of the conference and running the race and take away the recognition, which, if you're right, has value, right? That's an interest that is a valued interest in the law. And they haven't done anything wrong. I don't think you're contending that they did anything wrong. No, we are not. And so if anybody did anything wrong, it's the conference, and I get maybe there's a claim for damages, maybe there's not. We can talk about that. But are there any examples of cases where a remedy that takes something away from somebody who did nothing wrong and followed the rules of the race is considered an acceptable or available remedy? Well, Judge Robinson, now we're talking about equitable remedies, and the district court will have some discretion to determine how to fashion those. But the bottom line is the fact that a remedy might be difficult or might even seem unfair isn't a reason to ignore the federal law violation and to not give a remedy to the plaintiff. The problem with your summa cum laude example is that no one loses. Well, then let me give you an example. Let's say that you had a law school, and they awarded order of the coif to the top 10% of the class. But when they compiled all the grade point averages, the person in the registrar's office struck all of the women's names, and so that only men were awarded with the top 10% order of the coif. And they applied for jobs, and they had that on their resume, and then the women sued for sex discrimination so they could get the designation. Well, by necessity, if only 10% are qualifying, all the men who had that recognition would lose it if they fell below the line, and they would have to take it off their remedies. And I don't think any court would blink twice at doing that, even though it seems unfair to the men, because that's what the law requires, and that's what's fair to the plaintiffs who had their rights violated. Right. In your example of the racist class where the black student was denied an honor, it could be that there was only one valedictorian, and somebody else was the valedictorian, right? That person would be displaced if the person who was the victim of the racist rating, you know, was restored to being a valedictorian. That's exactly right. If the racist teacher had degraded... And the point also might be that there could be a remedy that is in between these things that might not be a complete expungement of the records, but might be some sort of notation about how everybody rated the race, right? That's possible. When you're talking about equitable relief, I won't say the sky is the limit, but certainly within parameters to make sure that the harm is actually remedied, the district court does have some discretion in how they're going to award relief. It may not involve simply striking from the records books entirely someone else's recorded times. Can I just ask about striking from the record books, the injunctive relief you seek that speaks both to the private records and public records, do you maintain that position? And if so, with respect to private records, how is that consistent with transunion, which distinguished expressly between records that were disseminated and records that weren't? Well, I guess that would be a good question for the conference and the schools is what availability private records have. I'm asking what relief you're seeking. Are you arguing there's an injury from a non-public record? And how is that consistent with transunion? There's a lot baked into that question, Judge Nathan, so let me try to unravel it. In a public school, there could be a public records request, and so even private records could be disseminated publicly. But in addition, I have to believe that the schools, when they're putting the names on the plaques and on the trophies and the trophy cases, they're doing it based on their internal private records. And so yes, our request for relief would include all of those things. Now, I don't know that for sure because this case was dismissed on the pleadings. We haven't had discovery. We don't know how the private records are used. If it turns out that those get locked in a box and they're never seen again, then maybe it looks more like transunion. But certainly at this stage of the case... Meaning there's no injury in fact with respect to that. Right. If it was true that it was recorded, put in a box, and no one would ever see it again. But of course, that's not the case here because we have public records, too. If one of our plaintiffs puts on their resume that they were a champion, and they tell that to an employer, and the employer goes and looks online, they're going to see that another girl had her name in first place, not this one, and they're going to think that she was a liar. There was some kind of public ceremony. I mean, I assume at the time of the raid, somebody was awarded different places, right? There was some kind of public ceremony. Somebody got trophies, right? There was, yes. So even if they don't maintain some kind of a plaque listing everybody in a public place, there was a public facing ceremony. And so if they wanted to print the records, they could issue a press release saying we reconsidered how we awarded the races, right? Absolutely. The Olympics and other worldwide sporting bodies do that all the time, where someone is disqualified after the fact, even many years after the fact. And there's a new medal ceremony to recognize the person who won. Because again, Judge Chen, this is much more than psychic satisfaction. It's the public recognition of something that you achieved that was great and good that others can hold up for emulation. The alleged injury is being deprived of the opportunity to compete for a championship. How does rewriting the records redress that injury? It's not just the opportunity. It's that had the rules been followed, as we alleged them, which we accept them for purposes of a motion to dismiss, they were the champion, but they weren't recognized as such. So it's not just an opportunity to be a champion or to advance to the next level of the regional races. How does rewriting the records redress the alleged injury? Because it recognizes the achievement that they actually earned, just like giving the order of the coif, or the summa cum laude, or the military honor. All these things are redressable. And when I think about Article III injury in fact, I think about Justice Scalia in Lujan and how low that bar is in order to get into court. What he said in Lujan is that deprivation of being able to observe an animal species is a tangible injury. If that's the kind of injury that could satisfy Article III jurisdiction, it didn't there because they couldn't demonstrate anyone was likely to look at a particular animal, then certainly these girls have suffered an injury in fact. And if she were on the other foot, the interveners would have suffered an injury in fact. Everybody except the conference and the schools are in agreement on that point, that when there's a legal violation and recognition is taken away, that's sufficient to get into federal court. And I would note that there are 22 states that have laws on the books which require all of their schools to assign athletic teams by sex, not by gender identity. And the same council representing the interveners here represent plaintiffs in some of those cases. And I'm sure they would agree that their clients have standing in those cases to proceed because they're alleging the same kind of injury and redressability that we are here. Can you point me to where in the complaint, just so I can sort of focus on the nitty-gritty of the complaint injury, where we should look to see these allegations of injury? What I'll do is I'll give you a page of our brief which has the appendix citations to the complaint. It's just easier because they're in one place. It's page 34 to page 35 of our opening en banc brief and it goes plaintiff by plaintiff, Sewell, Mitchell, Smith, Nicoletti and describes exactly what championships they were deprived of, what future races they would have qualified for had they not been bumped out of, for example, the top eight finishers, or what placements they had been downgraded from. So it's right there. Can I ask, do you think that it's necessary to establish an injury that they would have achieved a certain award or is it enough that they had to compete in conditions that they think are unfair? I mean, usually, you know, in the affirmative action cases, we don't say that the student has to prove that he or she would have been admitted before the discrimination. We think the discrimination is itself an injury. So is it necessary? I don't think it's necessary. It's certainly sufficient. But I want to be careful to draw a line there because you don't want to get too close to like observer standing or psychic injury. So say if you had an athlete who was standing on the sidelines and they watched a race where a teammate or someone else had to compete against someone in violation of Title IX, I don't think that they would have standing. But the fact that they had to compete, which is what happened with all four of the plaintiffs here, certainly that is enough. So you would need to show that they were deprived of some job opportunities as a result of their placement being a non-champion. That's not critical to your... It is not critical. That is an additional claim that we have for damages because it comes from the injury that they already suffered. They suffered the injury at the moment that they stood at the race line and had biological male competitors and then lost to those competitors in their races. Now the effects of that can flow into all kinds of different things. If you think about this in terms of consequential damages, one consequence is they didn't advance to additional races. Another consequence is they didn't get the gold medal or maybe a bronze medal. Another consequence is that when they applied to colleges, their records weren't as shiny as they should have been. Another consequence is when they applied for jobs, their employment resume doesn't show their accomplishments. The jobs issue was not in the complaint. So the fact that they lost out on employment opportunities couldn't possibly have been in the complaint. Is that correct? Judge Lohihei. Is it Lohihei? Close. Judge Lohihei. Lohihei. Lohihei, thank you. Judge Lohihei. I'm glad you gave me an opportunity to address that. At the time that the complaint was filed, of course, these were just high school students. And so they weren't thinking about applying for jobs after college. However, because those are consequential damages, so to speak, it would be appropriate if this case is finally remanded and decided on the merits that they would be able to prove those up and even amend the complaint if necessary. But they allege the harm and the redressability in the complaint and that's all we need to go forward at this point. But so as to ongoing harm, which you talk about in your brief and you've just described, not for the brief, tell me what paragraphs in the complaint go to any allegations of ongoing harm. Well, the primary ongoing harm in the complaint had to do with college scholarships and colleges. But even there, the timeline is now moving because our girls have graduated and they're going to college. And so the employment harm is a consequential damage that flows from that original harm, but it didn't take place until years after the complaint was filed and we've never had an opportunity to amend, do discovery, anything that you would typically do in a case like this. So in terms of consequential damages, those will continue to accrue as we go and we will amend the complaint accordingly once we're remanded and we have the opportunity to go through discovery. We can put on experts about what's been lost, they can depose the plaintiffs, they can depose the experts, and we'll get an answer to that. But all we need to decide today is whether they get in the courthouse door and under the precedent of seven circuits on athletic and academic records, with none going the other way, the answer is they get to move forward with their claims. In the short amount of time we have, I was hoping that we could move to the Pennhurst question. The way I understand the Supreme Court doctrine is that answering Pennhurst requires looking at the merits, and you are alleging that we aren't. Can you please harmonize those cases for me? Yeah, let's marinate for a minute in Pennhurst. As you know, that was a case that involved mentally disabled patients in a hospital, and their allegation was a federal right under a federal funding act to appropriate treatment in the least restrictive environment. The problem with that was that the federal statute was just a mere funding statute. All it did was it gave grants to states to help people with mental illnesses. It didn't have any substantive requirements at all for the states. Excuse me just a minute, there was a Bill of Rights in the Felony Disabled Act, right? And that was part of the question. There was a Bill of Rights. But what if there were actionable rights? Right, but when you read the Pennhurst opinion, what it says is that the funding mechanism was there simply to, quote, assist the state through their federal grants, and that the court said there was no indication that the act was creating new substantive rights, even through that Bill of Rights. And so contrast that with Title IX, which we all recognize created a new substantive right, no sex discrimination, equal opportunities for everybody in education, and that's what the plaintiffs allege here. They allege sex discrimination, and the perfect analog for this is the Ninth Circuit's decision just in 2020 in Mansourian. And there was a school district that was sued when they canceled the women's wrestling team. Now there's nothing in Title IX statute or regulations that put them on specific notice that eliminating a girl's wrestling team would give rise to Title IX liability, but yet the Ninth Circuit easily concluded that their policy was enough to show intentional conduct of sex discrimination. So is it your position that if you have an official policy of a funding recipient that facially discriminates, that's enough for Pennhurst in all circumstances? The policy is the difference. That's what the Supreme Court says in Gebter. It's what the other circuits have said on this point. And the reason that the Supreme Court draws that line between policies and what I'll call on-the-ground conduct or off-the-cuff conduct is that with the policies, you have an opportunity for the policymakers to consult with legal counsel and deliberate, and maybe they make a mistake, maybe they don't. How do you make sense of Jackson, which in addition to requiring an intentional violation says there's got to be a clear violation in that case of Title IX? A clear violation of Title IX. I think the phrase was clear terms of the statute, but the Supreme Court then explained what it meant by that in the Barnes case. And what they meant was that you can't just have vague notions of protection, which is kind of what the Pennhurst case was all about, but you had to have something to root right in the statute. And with Title IX, for example, it doesn't say anything about sexual harassment. It doesn't say anything about retaliation. And yet the Supreme Court has recognized that those are actionable for damages. But doesn't that mean we have to go to the merits? I don't understand how we say that this was a violation of Title IX without looking at what Title IX says. All you have to do is the same thing the Supreme Court did in Pennhurst. Decide at a very broad level, does this statute create rights? And it clearly does. It prohibits sex discrimination in educational opportunities. If the answer to that is yes, you don't decide whether these particular rights are actionable. That's going to be decided later. But to Judge Laillier's question, that's not what they did in Jackson. They start, they say discrimination on the basis of sex. But then, and it's clear. And then the question is, is retaliation discrimination on the basis of sex? And then it cites a case that says yes. And so that is an analysis of the merits, isn't it? In order to say that it's clear, they look to whether the allegation of the violation was there. Like I said, at a very high level, when you're asking, is this a vague, non-rights-creating statute versus is this a statute that creates a right to sue for sex discrimination, like Title IX, I think that's correct. But Mansourian didn't go any farther than that. They did not say that the school had to be on notice that eliminating the girls wrestling team was a Title IX. Did they follow the Supreme Court's decision or the Ninth Circuit's? The Supreme Court says the exact same thing. Gebzer says that intentional conduct, that whole inquiry that you're just talking about, is not applicable when Title IX claims involve an official policy of the recipient. That's in our brief at page 55. That's further clarified by Jackson. And Jackson seems to outline a particular approach, which is you figure out if it's an intentional violation. Then you figure out if there's a clear policy that's being violated. You can take or we can consider whether circuit courts, other courts, view it in a particular way. So if there's a conflict, for example, among courts with respect to whether a particular type of conduct violates the Title IX in this case, that would make it ambiguous. Then it would not be clear. Am I right in that approach or am I wrong in that? You are wrong in that approach for the same reason that a civil rights plaintiff in any context would still be entitled to damages relief against a public school or a local government entity if there was a circuit split that went up to the Supreme Court. Because the school or the entity would say, well, it wasn't clear. And the Supreme Court would then make it clear. And it doesn't matter whether it was clear or not, other than qualified immunity for individual officials. So that's about Jackson. So in Jackson, the court says the board should have been put on notice by the fact that our cases in canon, such as Gibson and Davis, have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination. Exactly. That's the answer. Because we interpreted it to encompass lots of different forms of sex discrimination, they're on notice for that. And we think that this is a unique case of intentional sex discrimination. It doesn't have to be noticed in a specific context, does it? Judge Manasci, that's exactly the point that I was trying to make in my colloquy with Judge Nathan. I think you said it better than I did. That there's a high-level determination about whether this is a statute that prohibits sex discrimination. With sexual harassment, we have decades of case law saying this violates Title VII, Title IX. We don't have that evidence. You don't need that. But I do want to talk about sex discrimination. The law is, there are, if anything, as we suggested in the panel opinion, that the cases were more the other way. But respectfully, the panel opinion didn't get that quite right if you're looking at the Supreme Court cases. The difference with the sexual harassment cases is that those arise, at least the ones that were cited, in the context where there was no policy. It has to be a clear violation. And under many decades of case law, it is a clear violation if a school or a school district knowingly lets sexual harassment proceed. I don't think we can say that here. Judge Chin, if I could finish my answer. The reason that that's different is because, inevitably, those are not pursuant to policy. It's pursuant to an individual who is making a spur-of-the-moment decision. The policy here is sex neutral on its face, isn't it? Whether it's sex neutral doesn't matter. If the school had a policy that their only athletic opportunity would be a football team and everyone could try out for it, that would still be a Title IX violation because none of the women would make the football team. But if I could finish the answer about sexual harassment, when you're talking about an individual agent of the entity making their own decision, then, yes, we require a clear violation because, in that instance, the school is deprived of the opportunity to consult with counsel and try to course correct. But when you're talking about a policy like the CIAC had here, that's the kind that five other circuits recognize don't require intent or knowledge of a particular violation to have been prohibited by prior case law. I see that there's two different kinds of notice here, right? There's notice of sort of facts and there's notice of the requirements of the law. Yes. And a lot of these cases deal with one or the other and some deal with both. Yes. I think it's clear when we talk about the intentionality requirement that there's not constructive notice, there's not respondent superior, that the recipient entity has to be on notice to be deemed to have violated the law. Exactly. But what I'm trying to understand is how any of that undermines the other principle that the legal requirements applicable to that recipient entity have to be clear. And I'm thinking not just about Jackson, but I'm looking at Davis, where the analysis of the court was looking at Title IX and its implementing regulations and asking whether it provided sufficient notice to schools that they would be liable for student-on-student harassment if they were deliberately indifferent. There's the notice of the student-on-student conduct, which is why you need the deliberate indifference in the notice, but the framework for analyzing it still evaluates whether the statute of limitations and implementing regulations put them on notice of their legal responsibility. Right, but Davis, again, the clear terms of the statute, as Barnes explained, simply meant not vague objectives. And there's nothing vague about the sex discrimination prohibition in Title IX. And that's why we have five circuits all on one side of this issue and zero on the other side. Was it clear at the time of Davis that the school would be responsible for student-on-student sexual harassment? I don't think it was clear to the officials, or certainly they would have acted in a different way, and yet the court said that kind of harassment could subject you to liability. Nobody's saying that novel legal theories can't support damages. The question really has to do with the extent to which the statute puts you on notice of a novel legal theory. I don't think that's what's being said. What I hear opposing counsel arguing anyway is that if the law is not clear, then that's a full bar to damages liability. And so if you have a novel theory, they could not have been on notice that they would be liable for that theory because no case has said so yet. But there were cases that had not said there were sexual harassment or retaliation claims, and yet damages were awarded a notice. I also point to the Office of Civil Rights providing guidance that they say they were following in there. Congress delegated the implementation of Title IX to that agency. What's your response to that? Does that not matter? It makes it – it certainly tinges the equities for the schools because in this instance you've got departments of education who are gyrating back and forth. And so it does leave the schools in a position of not knowing what the law is. In fact, under certain circumstances, under the guidance that just Bianca just mentioned, cisgender boys could join a team of girls. For example, in the golf context or in gymnastics. Is that correct? That is correct. And so there is some confusion there. So when you answer that question, you say there's some confusion there. Why isn't that enough as a matter of Pennhurst to say that the claim is barred? Because Pennhurst is not a qualified immunity defense. It's not one where you need a clearly established case or a federal policy that tells you what you're doing is wrong. All Pennhurst does is ask at that high level, is there a substantive right like sex discrimination that can be enforced or as in Pennhurst, is it simply a federal funding mechanism? And no one thinks that Title IX is a federal funding mechanism. The regulatory guidance were entirely in the opposite direction and required the schools to permit transgender girls, in this case, to join cisgender girls' teams. Would that be a Pennhurst problem? The answer would be exactly the same as the civil rights plaintiff who has one circuit on their side and ten circuits on the other side, goes up to the Supreme Court and wins. That plaintiff and the plaintiff in those other ten circuits that all went the other way are still going to be able to get a damages. No, that's not a spending clause case. The district court in footnote 15 said the plaintiff cite no case under Title IX or any other spending clause statute permitting liability to be imposed for conduct that was approved by the agency responsible for providing guidance to funding recipients. I think that is accurate, right? I do think that's accurate, yes. But when I look at cases like Mansourian and Simpson and Parker and Hall and Polorteno and Gebser itself by the United States Supreme Court, that's not the line that they're drawing. Again, there was no federal policy that said it's a violation to eliminate your girls' wrestling team, and yet the Ninth Circuit said they could be liable for damages. So the merits were ultimately that the unambiguous language of the statute says this is a Title IX violation, and your view would be that Pennhurst obviously wouldn't have caused it, right? That was a clear violation, and I suppose that can touch better on this question, that that's really a merits determination. If there's a belief that there's a separate requirement that it be a clear violation, that ultimately goes to the merits. No, I want to be careful about this. There's no intertwinement between the merits and the Pennhurst question. Now, the district court could have decided this case on 12B6 on the merits. The defendants asked them to do that, but the district court chose not to do that. It was based only on notice. If Davis says it has to also, in addition to being intentional, violate the clear terms of the statute, why isn't that part of the merits determination, whether it's clear or not from the language of the statute? I encourage you to put Davis and Barnes side by side and see what Barnes says about Davis, and it gives considerable illumination to that phrase, clear terms of the statute, by making clear that if the statute just has vague objectives, that doesn't put anyone on notice of anything, that's one thing. But if you have a statute that everyone understands, puts people on notice they can be liable for sex discrimination, that's another thing entirely. You said it wasn't a 12B6. It was a 12B6. I did say it was a 12B6. It was. Or intended to. So the trial court... Yeah, it was a 12B6 on damages. On damages, but not on the merits. And those two do not need to be intertwined, because the notice inquiry, as Gesber and the five other circuit cases that we cite make clear, are a question of whether this was a policy or whether this was spontaneous conduct. You made the point a couple times, if there's a circuit split, it's not clear, and then the Supreme Court decides. But your muscular theory of tenors, even if the Supreme Court decides, it doesn't matter, because for our purposes, we just assume that you stated a violation, and damages are available because it's an official policy, right? Why would it matter what the Supreme Court says on damages, as you're viewing it, as opposed to stating a claim under merits? I would agree with that, but the case would be quickly dismissed on the merits if the Supreme Court had gone the other way and said you didn't even get into a tenor. The view you're taking, it doesn't end with what the Supreme Court says, the statute says. Our view is that the substantive rule of the case is separate from the rule of notice, and that in the case of notice, it can occur in two ways. If it's a policy, then that's it. That's knowledge cases over on notice. Or alternatively, if there's not a policy, if you have this person acting in the spur of the moment, say that they had a person standing at the beginning of the race line, making on-the-spot decisions about who gets to participate in the race, those are the kinds of things where it has to be a clear violation, because that is responding at superior liability. That is where the school didn't have an opportunity to stop conduct they thought was improper ahead of time. But when you're talking about a policy, that's not the world that we're in. Can I ask about the status of these guidance documents? I've written some guidance documents that are issued by agencies, and it would be nice if they were just automatically dispositive, but I would think you would say that it's possible that a court might disagree, right? In many, many cases. And there's still a level of deference, but you can still get into court. Absolutely, and courts overturn guidance documents on a regular basis. I was asking, in Henrietta D, didn't we say that, you know, when Congress authorizes a cause of action and says that courts are going to develop it, that the recipient understands that the rules are going to be subject to judicial determination? Yes, that's exactly right. So if we have a cause of action under Title IX and understanding that courts are going to decide the scope of it, then fundamental things are unnoticed, but they can't be subject to judicial decisions, right? Yes, that's right. And just to assuage the court's concerns, it's not like most of these cases, at least in the athletic context, certainly sexual harassment would be different, that they're not going to result in multi-million dollar damage awards. I mean, I can see, it's going to be really difficult for us to prove that the economic damages case for the lost value of scholarship and college and employment opportunities. It may be at the end of the day that they simply pay a dollar in nominal damages and that's the end of it. But the point under Pennhurst, and everything you just said, Judge Bernaschi, is that when the Congress created that individual cause of action, they kind of set the minimum floor at nominal damages for a Title IX violation, whether they knew that their policy was in violation of the statute and the regulations or not. But it seems to me that what you're actually saying is that just by merely saying this is sex discrimination, they've satisfied Pennhurst, right? Because you're telling us that we don't have to look at what the statute actually says. So long as it's a credible allegation, yes. And we satisfy that here without further analysis because the Department of Education concluded that the defendants violated Title IX when we submitted this claim to them. And that was rescinded, so it's not binding on anybody. But it certainly shows that the allegations are plausible and on a motion to dismiss, obviously that's the standard that we're dealing with. Can I ask you a question that came up earlier about whether it's a sex-neutral policy? Isn't this a sex-neutral policy? I mean, there's a classification of teams by sex. There's sex-segregated teams and then they're modified by the gender-regulating policy. Isn't there just lots of classification on the basis of sex? I missed that word there. Isn't there what? There's not just classification, there's separation on the basis of sex. Yes. It sounds like this is a unisex track and field team. Right. Not like the football team hypothetical that I gave. There is a separation. Right, so we're in the world in which there is a sex separation and the question is whether the school is providing equal athletic opportunity under the regulation that allows them to have separate teams. That's precisely right. And that's our primary theory. My point was that even if we had one where it was a neutral policy like the football team, the disparate impact on girls that an athletic program like that would result in is itself a Title IX problem. So we don't have to have sex separation on its face, but we do. Yes. Thank you, Mr. Berg. Thank you. Good afternoon, Your Honors. Peter Murphy, arguing on behalf of the CIEC and the Board of Defendants today. Your Honors, there's two types of relief that remain at issue in this case. An injunction rewriting the results of some races that the plaintiffs are in high school and nominal damages for having to compete against transgender students in the past. Article III precludes   and therefore, the complaint's dismissal should be affirmed. In regard to the rewriting of Part 3, I would like to call The plaintiffs have not alleged any concrete or imminent harm from the mere existence of these records from year-old races. They don't claim, for example, that anything specifically turns on these results or that anyone will need to consider them for any particular purpose. In contrast, there may be, at this point, a violation. Nothing about a subset of high school track results would be so likely to, inherently likely, to affect the student's life, general life prospects. A federal court also cannot redress any cognizable injury here by removing the intervener's times in rewriting these records. The plaintiffs have no authority for the idea that Title IX permits such a remedy and we don't know how these races would have turned out if the interveners did not run. The plaintiffs claimed in their brief that revised records would boost their employment prospects, but that's not, in their argument, rather, but that's not pleading the complaint and requires inappropriate guesswork as to how third parties would weigh these results years down the road. In regards to the nominal damages claims, request for nominal damages, rather, that's barred by Pennhurst. The plaintiffs do not claim that the defense had proper notice required by Pennhurst and said they claim no notice is required because adopting the policy was an official act, but their challenge to the officially sex-neutral CIEC policy sounds in disparate impact, not the intentional discrimination in violation of the clear terms of the statute. As a result, the panel correctly found that the plaintiff's damages claims cannot proceed and with that, I would welcome the court's questions. The CIEC just decided that they actually agreed with the plaintiffs and did modify the records to remove the transgender records and reallocate the awards. Would the transgender applicants have standing to oppose that and seek a change back? Well, Your Honor, the records certainly are important to the intervening defendants and the records are... I just said it's speculative as to whether it has any consequences for employers and so on. Why would it be different for the two groups? Well, it is. To the extent it's related to a claim for employment, that those records are going to impact these students' employment prospects years down the road. I think that is entirely speculative, whether it's made by the interveners or the... If the CIEC decided tomorrow we actually agree with the plaintiffs that we're going to remove the transgender records from the records and reallocate the awards, the transgender applicants would not be able to sue the CIEC over that decision because the records don't harm them. There's no ongoing interest in the records. Is that right? Well, the CIEC would not do that because we don't... I understand that. That's a hypothetical. So if they did do that, would the transgender applicants be able to sue the CIEC and have standing to sue them? Likely no, Your Honor, because they're prior... They're not being able to. They're prior records. The interveners are here because they claim they have interest in the records. So you're saying it's inappropriate for the district court to allow them to intervene because they don't actually have ongoing interest in the records. That issue wasn't involved in the request from this court for today and I don't... You have a higher condition. Nobody has interest in these records, either the female plaintiffs or the transgender interveners. Well, the interveners... I'm sorry. The CIEC can do whatever it wants with them and no one will have standing. Well, the CIEC is not going to do whatever it wants because those records... It's a hypothetical. Right. I understand, Your Honor, but the records accurately reflect the races that were run. Changing the results of the records will not reflect  the plaintiffs came in. We all know that Ms. Mitchell, for example, finished third in a particular race and not first or vice versa. And therefore... Let's assume it's a different argument. If you agree with the plaintiffs, you would think there were two people who ran the race who were ineligible to compete because it was unlawful to include them. So it's like they were ineligible because of some other rule violation. So you might decide to reallocate the awards as we know from the briefing lots of athletic associations do, but you're saying the transgender athletes would have no standing to challenge them. I hadn't thought about that issue, Your Honor, because the plaintiffs are the ones moving to intervene. I mean, I'm moving to rewrite the records, not the interveners. It's a slightly different hypothetical if it was a doping situation where somebody used performance-enhancing drugs. You learn about it after the fact. The association cancels the, you know, basically reorders the awards. You're saying that that person who's accused of doping would not have standing either, right? Well, I think the doping is different, Your Honor. And in the case of doping, and I know the plaintiffs point to a specific provision addressing that, and in that case they're vacated, but there's no case out there or nothing in the provision. Would they have standing to challenge the vacature of their award-winning performance? If the person whose records were vacated, would they have standing? Yes. Well, potentially,  and maybe I misspoke before. You just said it was seconded as to whether any employer cared about it or whether it had any consequences. Oh, that's absolutely true. In the case of this case, if the doping is taken and loses the award, that person would have no standing to challenge that determination. If it's, maybe I misspoke, Your Honor. If it's, in this case, the intervening defendants have their awards. They have first place, second place, and whatever races. And that's the order of the COIF that we were talking about before. It sounds like you just think that they're entitled to those awards because you think it was appropriate for the race to be run that way. But isn't that a merits decision as to whether this was a valid policy or an impermissible policy? It's not a merits decision, Your Honor. This court can dismiss this case on standing without getting to the merits. It can find that Pennhurst bars their damages claims. Excuse me, Your Honor. Can I ask you, Counsel? Yes. Do you think that there is an injury, in fact, pled in this complaint that would be redressable by money damages if money damages were available? And if so, what is that injury? The chance to be champions. So they allegedly, they allege two things. One, we are denied the chance to be champions and also seek to have their records rewritten. And for the chance to be champions, they ask for nominal damages. Do you think that is an injury, in fact, that would be redressable by damages? Well, I don't think damages are available here. They are barred by Pennhurst. The nature of the question is, is there an injury, in fact, because there are two questions, injury, in fact, and that would be redressable by money damages if money damages are available under Pennhurst. No, your honor. Let me ask you about the chance to be champions because I know there is a lot of decisions relied on that. It comes out of our McCormick case where due to scheduling, one group was deprived of a chance to be champions. But they allege more than that. They are not just alleging harm because they didn't have a chance to be champions. The harm here is that they had fewer opportunities to be champions because of what they say was a Title IX violation. If that's true, why isn't that a harm? Even if you had a chance to win, if the rules were a violation of Title IX and weren't fair and reduced your chances to be the champion, why isn't that a harm? In McCormick, what this court was arguing  Title IX was a ceiling. Those girls were participating in different seasons. They weren't even in the correct season. If you are in the same season and have a chance to compete, if the rules are set up to violate Title IX and have a chance to win, isn't that a harm? Suppose the rule was that male athletes would start 100 yards ahead of female athletes. A female athlete who is really fast would have a chance to be champion, but certainly that would be a violation of Title IX. And a harm? Those are certainly not the situation where they're not even on the same field. They're on the same field.    They're in the same situation. I think what they've alleged is that facts show that they ran in the race. If that's true, if there is a Title IX violation, the rules were unfair and lessened their chance to be champion, isn't that a real harm? They haven't alleged that, Your Honor. What they've alleged is... Paragraph 4, they have materially fewer opportunities to stand on the victory podium because of a Title IX violation. And the question is, if that's true, isn't that a harm? When you're deprived of the chance to be champion, you can run, you're in the race, but you're not going to be the champion because the rules violate Title IX. I don't think this Court has ever recognized that allowing someone to run... Like for McCormick, for example, like I was saying, they were in a different season. They weren't even on the field. In this case, the rules allowed Ms. Mitchell, Ms. Sewell, et cetera, to run against the intervenors. They're all in the same race. They had that opportunity. The question is whether those rules were permissible, right? So if the CAC just said we're not going to have a separate men and women's team, we're just going to have an open sex team and men and women will run against each other, you still think that the women would not have a standing to challenge that because they had a chance to run against the men? Title IX permits sex-separated teams. It doesn't require it. Your client decided we're not going to have sex-separated teams. We're just going to have one team where men and women will run against each  I don't know, Your Honor. That's a different situation than we have here. It is a material different situation. Here we have the sex-separated teams. We have an opportunity for these individuals to run in their races and the chance to be champions. But isn't that a disputed fact as to whether they actually had a  against these transgender athletes? I'm sorry, Your Honor. The other side, the plaintiffs would not agree that they had a chance, right? Correct. So isn't there a dispute then? It might be that you're right. I think you're right, Your Honor. They allege they didn't have a chance to be champions, but they did. They had the opportunity to run in the race. This isn't a case where they lost every single time. In fact, they lost not only to the intervenors, but to a lot of cisgender girls as well. That's reflected in all the race results that are in the briefs and incorporated by the parties. Two championships, if your word in Miller were not in the race, right? According to their allegations, correct. She finished third or second in two races. Why isn't that a harm when you're deprived of a championship? For a harm, they're asking the court to do two things. One, to rewrite the records. As we heard in Title VII, courts have the ability to expunge an employment file. Disciplinary infraction based upon retaliation. In order to correct that and avoid ongoing harm to an employee, you could order that be removed from the record. Why isn't it the same for Title IX? For Title IX, as we heard before, they're not seeking to change the records for their psychic satisfaction. Changing the records will have no practical impact for these individuals. First of all, it's not even alleged in the complaint that it's going to impact their employment prospects. Second, they haven't identified anything other than the psychic satisfaction. The panel said athletic experience may be a significant factor for prospective employers in their hiring decision, but then said they couldn't show that employee would care where they finished. You said that in your brief as well. The benefits of that is that employers may consider a host of other factors. When you apply for a job, where you went to college, what your major was, what activities you were involved in, et cetera. I think that bumps up against the caution from the Supreme Court that says not to consider the judgment of the employees. If psychic satisfaction is not enough... That would be grades as well. Disciplinary students. We don't know how employers will interpret disciplinary infraction. I respectfully disagree. Grades on an official transcript... Decision makers decide how much they should   don't have to wait. Those are core educational functions. The problem here... If I run a race and I think I won and the referee refuses to acknowledge my victory and I want to claim I won the race and he refuses to do it, don't I have that piece of controversy with that person? I want something and he refuses to do it. This is not an abstract thing. Did you win the race? I missed the beginning of your hypothetical. You think you did or you did. Whether I actually did or not. If I alleged I was entitled to win... The answer is I did. If we are at the stage, it means I did. If I have a dispute with the referee who is not acknowledging my victory and I sue the person. It's true. I'm not adding allegations. Why is that a case of controversy? I find it hard to believe that case would make its way into federal court. My question is whether I have a dispute. You might not have a cause of action. Here, that's one of the issues. I have a dispute with somebody. I might not be the cause of action. Before you get to the merits, you have to have that threshold showing up standing. This court has said that repeatedly. I want to say I won the race. The referee is telling people somebody else won the race. I'm injured by that. It's caused by that statement. I apologize. I'm still confused by that. I understand where you finished in the race. We know where they finished. They finished 8th, 9th, 3rd, whatever it is. We accept the legitimacy of the plaintiff's legal theory. We assume it's going to succeed. The legal theory and the facts where we're accepting all the facts. They allege that the transgender athletes were not eligible to compete in the race. I disagree with that. Let's assume they weren't eligible to compete in the race. It was illegal to do so. It's obvious they finished three instead of one. Isn't that true? They don't like the rules. I thought I heard counsel admit that the interviewers were permitted to participate in the race. That's what they're alleging. Let's say the CIAC policy was that everybody could win in the race but we're going to allocate the first place trophy to the first place white finisher. After they award the trophies, could a black student sue the CIAC and say look, I finished ahead of the person who got the first place trophy. I want the awards reallocated. They would not have standing to do that? I can't imagine that would ever happen. I understand. But would they be able to sue? That's just blatant discrimination. Here, one of the things we need to consider is what was the CIAC and what were the board defendants being told. Under the allegations of the complaint, was this discrimination? No, Your Honor. Here's why. Because as you went through a little bit with the opening counsel, guidance from what the board defendants were being told was not only should transgender students be allowed to participate, but they must be allowed to participate. That comes from 2014 notice. Transgender students are not  participate in such activities. I think given this guidance, if the CIAC did not have this policy, under all of this guidance, 2014, 2015, 2016, that goes farther and says transgender students must be allowed to participate in such activities consistent with their policy. I don't know, Your Honor, but I know in this case, this is what the CIAC and the board defendants were being told. This is what their policy comports with. No case. As the panel said. I'm sorry, Your Honor. For some reason I'm having a hard time hearing you. You're saying essentially those guidance documents became obligatory. That is not regulations. It is an interpretation. What I'm saying is this court said in the university case, those are things the court needs to consider. As the panel said, neither the    board has a right to participate. If it was the hypothetical we talked about earlier, the CIAC eliminated men's and women's teams and said all men and women have to compete against each other on one team. Would the women be able to sue over that? We're back to the same hypothetical. I just don't know because right now what we have is two teams. You don't think the recipient has noticed that the allocation of athletic opportunities between men and women is a condition of Title IX funding? It is. In that case you said there's only one team. Here we have two teams. Here what we have is getting back to your original question. The CIAC and the board are being told by the federal government all those things. The Jackson court brought that up. They said look at the statute, look at all the court of appeals cases and look at what the regulation said. The regulation said for 30 years retaliation was not allowed under Title IX. 30 years. Here it's the exact opposite. The court said because we know          as other people, it was clear that retaliation was prohibited. It was clear that retaliation was prohibited but not retaliation against a person. The Supreme Court said look at the statute, look at the court of appeals, look at the guidance from the agency that's charged with enforcing that statute. That's the Department of Education. Can I ask you about the question, you're speaking to it. When I read your brief, it seems to me thing something clearly established for notice to be satisfied. Maybe I'm misunderstanding your argument because I never understood to operate as something akin to qualified immunity. What am I missing? It seems to operate similar to qualified immunity. That's how you think it does operate. Look at what the Supreme  in coming. When someone receives federal funds, they need to know what the rules are and what penalties are on the table. You don't want to get in the  that. It's consistent. It's consistent. For example, they present as a female all day during school. They're treated all day. Athletics are an extension of that. Conceptually, it makes sense. That's what is important to your question. I know I'm significantly over my time. Thank you. Thank you, your honor. Thank you,     behalf of the interveners, Andrea and Terry. I'll begin with the first question. The first question is, is there a     this case? I'm going to start with Pennhurst. I think this case is in an unusual posture. Usually, if you look at Davis and Jackson, first the court decides whether there was a Title IX violation. After making that determination, the court turns to whether Pennhurst was satisfied. As a result, we're being asked to look at Pennhurst first. I think that has generated some confusion here. Our understanding of Pennhurst is that there are many  where the plain terms of the statute prohibit certain conduct. It doesn't matter if the application of the statute was unexpected or unanticipated. For example, in Gavin Grimm's case, the fourth circuit trial, the plain terms of the statute prohibited the conduct. When Pennhurst talks about something as a clear violation, we don't interpret that to mean was it clearly established as unqualified immunity. We interpret that to mean was it prohibited by the plain text of the statute. There are plenty of instances where the plain text of the statute doesn't resolve the question. I understand the plaintiffs to be basing their claim on the theory that allowing transgender girls to participate on the same teams as other girls constitutes discrimination under the statute. We think that's absolutely incorrect, but we think the court needs to resolve the merits and Pennhurst together at the same time. We  think the court needs to hold the Pennhurst question in abeyance until the merits question is resolved. Why does it have to be in that order? Is there anything prohibiting us from dealing with the Pennhurst issue before the merits issue? Well, I think not if the theory were different. If the theory was based on guidance, I don't think there would be anything stopping you. In this instance, it's a little awkward to hypothesize that they stated a valid title 9 claim and then ask whether this   is  to that. If you did not separate the teams by sex, you just said men and women compete against each other and women did not compete successfully, isn't that the kind of thing there was a lot of litigation over with? I think that situation is plainly false. They say exactly what the test is for that. Aren't the allegations here that this is tantamount to that? I don't know. The idea that it's far afield from a normal title 9 claim doesn't seem right. I'm saying that that specific situation is far afield from a normal title 9 claim. I do think that is a separate issue from whether the plain text of the statute by itself would itself compel that conclusion. You are saying at least in this context it's official action and the nature of the complaint, the merits question as to whether the state claims for title 9 should come first or is so interwoven you can't separate them out and do them independently as has been done here. That's your argument, right? Yes, it is. As a process matter, if that's right, why is it better for us to do it  I think either course of action would be perfectly appropriate. If the court decides to remand, I think it should be a limited remand to address the merits first and then have the case returned in the interest of efficiency to the panel. But I think whether the court addresses the merits here or the district court do it first, I think either would be a fine exercise. If it returns to the original panel, we'd be happy with that too. Plaintiffs counsel suggested a very easy standard for penhurst. They use the word credible. If they credibly allege a claim, would you accept that or would you put a little more meat on what the obligation was? I wouldn't because usually you don't get to penhurst until a claim has been established. There is an abstract theoretical tenor to the argument because usually you don't get to penhurst before you establish that a violation occurred in the first place. Every example of the Supreme Court case does just that. They embed that merits question first and even if it's a question of is somebody on notice of the conduct, it starts with is the conduct a violation and were they on notice of the conduct that is the question of the merits question as a sequencing matter first. Can you agree with that? You also agree that we are not compelled. This is an unusual case. I don't think in every instance the court is compelled to do that. On the issue of injury in fact, we absolutely agree. I guess an example would be let's say new title 9 guidance came out. A new title 9 regulation came out. It had been previously established by a prior court decision. I'm thinking of a Chevron type issue. A new regulation comes out. The question is whether or not the agency permissibly interpreted the terms of the statute. I think in that situation there would be a Pennhurst problem. The court would not have to decide whether that regulation is valid under Chevron in order to say that the school did not have adequate notice. It could be applied going forward but not retroactively. That is the example I'm thinking of. My hypothetical was there is pre-existing precedent. The statute does not require that. With respect to the injury in fact, we agree there was an injury in fact in the sense that they raced in a race and they placed behind where they thought they should have because they participated in a race. We think it is important to accurately describe what the injury in fact is. I don't think the allegations of this complaint adequately allege diminished opportunities to be champions. If you look at page 14 of our brief, we lay out the various times they won against Andrea and Terry. Mitchell said she was denied four championships competing against them. She also won four championships competing against them. Smith raced against them on two occasions. On one occasion she beat them. On the other occasion Terry beat her. I would encourage the court to be specific about it. They have been specific about certain races. They would have been the champion but for the policy of the schools. I think it is correct that that satisfies injury in fact. I don't think their selective inclusion of some races while omitting every race they won allegedly the type of diminished opportunities. I think just losing one race is a concrete thing that happened to them. I don't think their rhetoric regarding these races are things the court has to take as true. They leave out the entire indoor 22 season where Terry was defeated over and over again. I just think that in looking at what plausible allegations should be accepted as true, it is important to be precise. Council talked a lot about consequential damages and consequential harm. We think that is right. Damages are the traditional remedy to the   it is important to be precise. Plaintiffs haven't pointed to a single example in the specific context of athletics. What about the example I gave before? If the CIAC decided they agreed with the plaintiffs and removed the records and reallocated the awards, would your clients have standing to challenge that? I think there is a distinction between retroactively disqualifying someone and taking records away from someone who was qualified to compete at the time they competed. At the same time, we think addressability assumes they are wrong about the inclusion of the transgender competitors. I think you have to look at how this is handled in the world of sports. They pointed to every example they can find in the world of sports. They haven't found an example that matches this situation. I do recognize there is ambiguity in the court's case law for whether this equitable judgment is a merit judgment or a standing judgment. There is distance between the two. They are not the same analysis. I think it is a hard question. The court has to resolve that. I don't think the case law is crystal clear about the circumstances in which the availability of a remedy goes to merit. I want to be candid about that. We think there are other situations in which altering employment tests are permissible. I think there are sensitive questions that the courts have to consider. In this case, we are dealing with the context of sports where plaintiffs are being denied recognition. It is relevant to look at how the situation is dealt with. The conference has a procedure for rewriting directors. Am I correct? If they will do it in that situation, why couldn't the court do it for equitable reasons? My answer to that question is that plaintiffs are saying they are denied recognition for  organizations. I am not saying there is a metaphysical reason, but the remedy they need is athletic recognition. That is not the type of remedy that sports organizations provide in the context of someone who is eligible at the time. If there is a new doping rule that says actually the substance shouldn't be allowed. They would say ineligible because it violates Title IX. I completely agree with that. In fashioning a remedy, it makes sense to look at what athletic organizations do. I completely acknowledge that the court has brought equitable powers in this area. One example is the U.S. versus Teamsters case in 1977. If the court has brought equitable powers, you are saying they are not entitled to this remedy. I don't think the court's position is crystal clear. Over when that is a question. Does that limit the power of the court? I think if this were a case where there were financial consequences attached to the record as opposed to the satisfaction of having credit where credit is due, it wouldn't be relevant.  wouldn't be relevant to what athletic organizations do. When the claim here is there is an inherent value to records, I think it is relevant to look at athletic organizations. I think you are saying the novelty of the remedy here is not an impediment, but we should be very careful in crafting that. I am happy to associate myself with that. Your Honor, the court should get to the merits to resolve the issue. If I could say don't worry about this because it will be resolved on the merits anyway, I would. The only reason I can't say that is because of this article three issue about redressability. That is not the hill I am here to die on. I think this claim fails on the merits. I would like to say one thing about what sports organizations do. When we have examples of the ineligible competitor, they do two things. They allocate   the next place finisher. Isn't the reallocation giving credit where credit is due? Yes, but I think that reallocation is done in context in which someone participated contrary to the sports organization. We don't have any objection to the practice of reallocating awards. We are just saying that is not done in these circumstances. You do in the context where that reallocation takes away from somebody who competed fairly and appropriately given the rules that were presented to them for the opportunity to participate in other competitions as a result of that reallocation.   have any objection to that at all. To take that away from them regardless of whether the conference was wrong and is subject to damages. I think that is an extremely important situation. I don't think it completely resolves the question. I don't  resolves the question because let's say there is a discriminatory employment test. Someone gets a job as a result of passing that discriminatory employment test. Courts do have broad powers to provide the job to people who are unfairly excluded. Sometimes in some circumstances if it is an inherently unique job someone can be bumped. I think that is not the preferred remedy.  say that as an absolute matter it is never appropriate to negatively affect the right of a third party. I think that is not the right thing to do. If the appellants get the release they seek and not only is their placement stricken, I think the request is to delete their indisputably accurate time, will they be able to tell people I ran this race as a high school student and I won? I think your Honor under their request they wouldn't which is why I think it would be an inherently inequitable thing to do here. I would love to talk about my clients instead of the standing issues. Athletics means as much to my clients as to their own heart and soul. They didn't win every time. Their times were not outside the range of what a cisgender female could perform. They don't do athletics in college anymore because of how awful this whole situation has been. In contrast the plaintiffs are all college athletes. Some have won scholarships. They're competing at elite levels. Three of those plaintiffs only raced against my client on a single occasion. It's an equitable argument. I think if the court is convinced this is a remedy that could not be awarded because the equities are so far against the plaintiffs I think that would present a question. In my preferred world this would be resolved on a 12B6 motion combined together as quickly as possible. We wouldn't get to the point of what an equitable remedy is here. I think I'd be happy with either one. I'd also be thrilled to answer any merits questions but I take it that's not what the panel is interested in talking about today. Hello, again, your honor. I have four points and two pieces of really good news embedded in those four points that I hope will make your job easier. The first point on injury in fact, my friend at first seemed to say that both the intervenors and the plaintiffs lacked any redressable harm. That one is logically untenable. The other would gut Title IX for everybody. It would not only prevent the plaintiffs from going forward here, it would prevent transgender athletes from going forward. That can't possibly be right. The second point is this little factual point that my friend for the intervenors raised about page 14 of their brief. That addresses a couple of situations where their clients did lose. That doesn't mean our clients weren't deprived of other awards and races they lost. Those are documented on page 34 of our opening brief. The first piece of good news is that the intervenors and the plaintiffs agreed that there is an injury and that it's redressable. You don't have to resolve 10 hertz damages today. That's the first piece of good news. The second piece of good news is that when it comes to remedy, that's something you don't decide now. We cite the Supreme Court case at page 21 of our reply brief. That's not something that gets addressed at the outset. You can set aside the remedy too. Those are the two pieces of good news. I want to drive home a point about Jackson I didn't make. That case involved a girls basketball coach who complained that the girls basketball team was not getting the same resources. The allegation was retaliation. The Supreme Court ultimately viewed the merits together. The district court and the 11th circuit said that the title IX rubric did not establish a claim for retaliation. The Supreme Court reversed that. The school district wasn't insulated from damages. Ultimately they were bound by the Supreme Court holding. Once the Supreme Court said it was available, that was enough. You could resolve it in our favor, but you don't have to get to the final outcome. The last point I want to make is that the school cannot enact a discriminatory policy and say that there is no harm. I welcome that determination. I do think it should take place in the district court. The panel didn't decide it. We haven't briefed it at any stage. This court was inclined to jump in as a court of first review instead of appellate review. We would ask for an argument so we could talk about it. I thank you for your time. We did say that at the panel stage. That was not a question that this court asked us to brief. We would rest on the panel brief. Thank you. Thank you all. We will take the matter under advice. I ask the clerk to adjourn. The clerk has adjourned.